IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| COUNTY COMMISSIONERS OF CHARLES COUNTY, MARYLAND | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Civil Case No. AW-08-3369 |
| PANDA-BRANDYWINE, L.P. | ) ) | |
| Respondent | ) | |

**<u>MEMORANDUM OPINION</u>**

Petitioner, County Commissioners of Charles County, Maryland ("County" or "Petitioner") brought this action for declaratory judgment seeking a determination of its rights and obligations under a contract with Respondent, Panda-Brandywine, L.P. ("Panda" or "Respondent"). Before this Court is Petitioner's Motion for Summary Judgment (Doc. No. 31) and Respondent's Cross Motion for Summary Judgment (Doc. No. 30) pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court heard oral arguments on these motions on September 29, 2009. The central issue for this Court to resolve is whether the County is obligated to provide Panda with 2.7 million gallons of Treated Effluent a day without any qualifications or restrictions on Panda's use of the water. For the reasons articulated below, the County's Motion for Summary Judgment is granted and Panda's Cross Motion for Summary Judgment is denied.

1

**FACTUAL BACKGROUND**

This contract dispute appears to arise from the Petitioner's attempt to sell unused Treated Effluent Water[1] ("Treated Effluent") to Competitive Power Ventures, LLC ("CPV"), which is a competitor of the Respondent. The County and Panda entered into a contract on September 13, 1994 in which the County agreed to sell and Panda agreed to purchase Treated Effluent from the County's Mattawoman plant. The contract term is 25 years and permits Panda to exercise five-year options on three separate occasions, which could potentially increase the contract duration to 40 years. The contract clause at issue provides:

> The Commissioners agree to make available for sale to Panda 2.7 million gallons per day ["MGD"] of Treated Effluent from Mattawoman and Panda agrees to purchase from the Commissioners all or part of such Treated Effluent, under the terms and conditions set forth below. Except as provided below, the Treated Effluent shall be used by Panda as the primary cooling water source for the cooling towers associated with the Facility.

The contract recital states that Panda applied for a certificate "to construct a 230 megawatt ("MW") electric generating facility in Brandywine, Maryland (the "Facility"), which the County interprets as defining the term "Facility." Based on the information provided in the record, it appears that the parties decided on 2.7 MGD because of an independent study conducted by Panda's engineers, which indicated that "about 1.8 MGD is actually required under continuous 230 MW [mega watt] production." (Doc. No. 31, Ex. A at 40.)

The County also reserved the right to sell unused Treated Effluent to third parties; however, the contract terms expressly provide that "Panda shall have priority over the use and transportation of the Treated Effluent." (Panda Agmt. ¶ 2e.) Within this clause, the County agreed that it would "not enter into any agreement or construct any connection which would

---

[1] The parties' agreement defines Treated Effluent as "wastewater produced by the [County's] Mattawoman plant which has been treated to control pollutants and is discharged in the Potomac River pursuant to a discharge permit issued by the Maryland Department of the Environment." (Agmt. at recital 1.)

have an immediate or long-term consequence of diminishing the amount of Treated Effluent transported to the Facility . . . without Panda's prior written consent." (*Id.*)

On July 9, 2008, the County Administrator sent a letter to Panda's representative seeking agreement of the County's interpretation of the contract terms that "Panda cannot use the Reclaimed Water Allocated . . . for any expansion of its Facility and that Panda had no right to sell the contractual amount of Reclaimed Water to other users." (Doc. No. 30 at 5.)  The County's letter expressed concern that nearly 1.0 MGD of available Treated Effluent was not being used, and thus uncompensated for, because in "the 14 year term [of the agreement] Panda has not purchased more than 1.7 MGD of Treated Effluent . . . ." (Doc. No. 31 at 1.)  Panda claims that it does not possess the ability to determine whether the County's historical usage records are correct but also does not appear to have the ability to dispute it.[2]  Panda's representative responded in a letter dated July 25, 2008, and indicated that Panda was aware that the County intended to sell the excess effluent to CPV and that it disagreed with the County's interpretation that the unused 1.0 MGD under the Panda agreement could be made available to CPV.

On December 10, 2008, the County and CPV entered into an agreement, which provided that the County will deliver 5.4 MGD of Reclaimed Water from June to October and 3.6 MGD from November through May.  The County contends that it needs the CPV agreement to increase employment opportunities, create tax revenue, and help "clean-up the Potomac River and the Chesapeake Bay by eliminating the disposal" of the excess Treated Effluent into those waterways. (Doc. No. 31 at 2.)  Because the County acknowledged that on rare occasions the

---

[2] As explained during the hearing, Panda only pays for the amount of Treated Effluent that it actually uses, which is measured by a meter located at the County's plant.  The County used past billing records to determine that Panda never used more than 1.7 MGD.  Panda explained that the meter used to measure the amount of treated effluent coming into its facility has been broken for years.  However, it does not appear that Panda has ever disputed the amount charged by the County.

amount of Treated Effluent at any given time could be as low as 6.5 MGD, the County would potentially be unable to meet its requirement to both Panda and CPV during the months of June to October, especially if the County is required to provide 2.7 MGD to Panda regardless of the actual amount used by Panda.

Panda sought reassurance from the County on two separate occasions that the County would fulfill its obligation to deliver 2.7 MGD of Treated Effluent to Panda. The County, on the record, conceded that it is obligated to provide 2.7 MGD of Treated Effluent, but only to the extent that Panda does not sell any amount to a third party and that such amount is actually needed at the current 230 MW facility. Panda disputes that its right to 2.7 MGD of Treated Effluent is limited in any way. Thus, the County has brought this declaratory judgment action[3] in an attempt to move forward with its agreement with CPV.[4]

## **STANDARD OF REVIEW**

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). To defeat a motion for summary

---

[3] The Court reiterates its earlier decision in the Memorandum Opinion (Doc. No. 21), issued on May 26, 2009, in which the Court denied the Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction. In that Opinion, the Court explained that the very purpose of the Federal Declaratory Judgment Act, 28 U.S.C. § 2201(2006), is to prevent the threat of litigation by resolving real cases and controversies. The Court believes that a declaration of the disputed language in the contract will serve to clarify the respective positions of the parties, permit the County to proceed with other contracts, and hopefully avoid potential litigation.

[4] The County and CPV have an October 2009 deadline to resolve this dispute. Moreover, according to correspondence from the County, Panda has requested that the Maryland Public Service Commission decline to grant CPV's motion requiring investors to enter into contracts for the sale of power from CPV's proposed generating facility until this dispute is resolved.

judgment, the nonmoving party must provide evidence that shows a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998). When parties file cross motions for summary judgment, the court must view each motion in the light most favorable to the non-movant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

## ANALYSIS

I. **Contract Interpretation Under Maryland Law.**

This Court must apply Maryland law regarding the interpretation of the contract because the parties' agreement expressly provides that Maryland law governs their contract. Maryland courts apply the objective theory of contract interpretation in which an unambiguous contract must be given the effect of its plain meaning in the context in which it was employed and without regard to the parties' subjective intent at the time of formation. *Nova Research, Inc. v. Penske Truck Leasing, Co.*, 952 A.2d 275, 283 (Md. 2008). A contract is ambiguous if a reasonable person in the position of the parties would reasonably find the language susceptible to more than one meaning. *Id.* If the court determines that the contract is ambiguous, then it may use extrinsic evidence to determine the intent of the parties. *See Johnson & Towers Balt., Inc. v. Hunter*, 824 F. Supp. 562, 570 (D. Md. 1992). The Court begins with the language of the contract and determines what a reasonable person in the position of the parties would have meant when the contract was executed. *Nat'l Union Fire Ins. v. David A Bramble, Inc.*, 879 A.2d 101, 109 (2005). The Court must "look to the entire language of the agreement, not merely a portion thereof" in interpreting a contract. *Nova Research, Inc.*, 952 A.2d at 283. Only an unambiguous

5

writing justifies summary judgment without resorting to extrinsic evidence. *Wash. Metro Area Transit Auth. v. Potomac Inv. Prop.*, 476 F.3d 231, 235 (4th Cir. 2007). If, after having examined this extrinsic evidence, there still remain genuine issues of material fact regarding the contract's interpretation, summary judgment should be denied, and resolution of these issues should be left to the trier of fact. *Id.* Courts should avoid interpretations that are void of "commonsensical perspective" and should prefer an interpretation that makes the contract fair and reasonable over an interpretation that "leads to either a harsh or unreasonable result." *SDC 214, LLC v. London Towne Property Owners Ass'n, Inc.*, 910 A.2d 1064, 1070 (Md. 2006) (internal citations omitted).

    **A. The Language of the Contract Unambiguously Defines the Term "Facility" as the 230 MW Plant in Brandywine, Maryland.**

As stated above, the first paragraph of the parties' agreement provides that the County "make available for sale to Panda 2.7 [MGD] of Treated Effluent." Neither party appears to dispute that the maximum amount of Treated Effluent that the County is obligated to sell and that Panda is entitled to purchase is 2.7 MGD. In fact, during the hearing on the motions for summary judgment, the County conceded that it would be obligated to provide 2.7 MGD to Panda if Panda actually needed such amount at the current 230 MW facility. The County also conceded that Panda would have priority to that amount, if needed, over third parties contracted with the County. Instead the real dispute is over whether the terms of the agreement limit Panda's use of the Treated Effluent to Panda's 230 MW facility as it existed at the contract formation or whether Panda is entitled to use the Treated Effluent at an expanded facility or for resale to a third party.

The Petitioner interprets paragraph 1 of the agreement to restrict Panda's use of the Treated Effluent exclusively to Panda's facility as it existed when the contract was formed. In

support of its interpretation, the Petitioner points to the second sentence of paragraph 2 which states, "Except as provided below, the Treated Effluent *shall be used by Panda* as the primary cooling water source *for the cooling towers associated with the Facility*." (emphasis added). Furthermore, the Petitioner directs the Court to the second recital of the agreement to support its proposition that the term "Facility," used throughout the contract, is defined as "a 230 megawatt electric generating facility in Brandywine, Maryland."[5] (Doc. No. 31 at 10.)

On the other hand, Respondent argues that the County is obligated to "supply Panda with up to 2.7 MGD of Treated Effluent, without any express or implied limitation on Panda's right to receive this quantity of treated effluent or the manner in which it is used . . . ." (Doc. No. 30 at 1.) Respondent reads paragraph 1 with the following emphasis, "Except as provided below, the Treated Effluent shall be used by Panda *as the primary cooling water source* for the cooling towers associated with the Facility." (emphasis added.) Thus, the Respondent believes that the second sentence in paragraph 1 of the agreement is merely restricting the source "from which Panda generally may obtain treated effluent," and not limiting Panda's use of the Treated Effluent or the location of the use. (Doc. No. 30 at 17.) In support of its reading, Panda directs the Court's attention to paragraph 7(d) of the agreement which provides that "Panda will exclusively utilize Treated Effluent in the cooling towers except . . ." where the effluent has too much pollution or "in the event that the supply of Treated Effluent is curtailed so as not to meet the daily requirements of Panda for the operation of the cooling towers due to any problem not within the exclusive . . . control of Panda." Moreover, in response to the County's reliance on the second recital to define the term "Facility," Panda refers to several Maryland cases to support

---

[5] Recital 2 of the Agreement states that "Panda has applied with the Maryland Public Service Commission (the "PSC") for the issuance of a Certificate of Public Convenience and Necessity (CPCN) to construct a 230 megawatt electric generating facility in Brandywine, Maryland (the "Facility"). The Facility requires the use of water for the operation of cooling tower[s].

its arguments that Maryland law disfavors the use of contract recitals to override the clear and unambiguous language of the operative terms of the agreement.  In any event, Respondent argues that the second recital does not in any way limit the phrase "cooling towers" to "existing units of equipment at Panda's plant" and the ordinary usage of that term in Panda's line of business provides a clear meaning of the term. (Doc. No. 30 at 19.)

The Court has considered the parties' arguments and finds the meaning of the term "Facility" to be unambiguous.  Respondent's emphasis on the "primary source" within paragraph 1 ignores its own case reference that Maryland courts "look to the entire language of the agreement, and not merely a portion thereof."  Accordingly, when paragraph 1 is read as a whole neither the parties nor the Court can ignore that the obvious purpose of the contract was to sell Treated Effluent for Panda to use in the cooling towers of Panda's facility.   Although the second sentence discusses that the Treated Effluent is the "primary cooling water source" the language before and after this clause clearly shows that the water "shall be used by Panda . . . for the cooling towers associated with the Facility."  Furthermore, when read in its entirety, the purpose of paragraph 7(d) unambiguously addresses Panda's concern for an alternative source of cooling water in the event that the Treated Effluent is either unsuitable or unavailable to meet the needs "for the operation of the cooling towers."  (Panda Agmt. ¶ 7d.)  Thus, although Respondent is correct that both paragraphs discuss Treated Effluent as a source of cooling water, it is unambiguously clear that the purpose of the contract is to provide a water source for use in the cooling towers at Panda's facility, and not any other plant.

The Court is also not convinced by Respondent's attempt to downplay the second recital of the contract.  Although under Maryland law, "'the operative part' of a contract determines 'what the parties actually did' by entering into the contract," the recital is not necessarily

ignored, especially were the recital provides clarity to a term used throughout the contract. *See Pulaski v. Riland*, 26 A.2d 907 (1952); *Inland Mutual Ins. Co. v. Davenport*, 247 F. Supp. 387, 393 (D. Md. 1965) (declining to address whether under other circumstances the recital could be used to limit the operative terms of a contract because in that case the recitals "did not prevent [the parties] from relying on the operative part of the agreement . . . ."). Instead, as Petitioner explained, "courts must allow the parties of a contract to define terms." *Envtl Prods. Corp. v. King Companies, Inc.*, 1995 WL 81740, at *5 (4th Cir. 1995). Petitioner cites to the *United States v. Bethlehem Steel Co.*, 215 F. Supp. 62, 64-65 (D. Md. 1962), in which the court stated,

> When the parties have defined a term in an agreement between them, and have obviously used that term in accordance with the definition in many portions of the agreement, a strong showing is required to establish that a different meaning of the defined term was intended in another portion of the agreement . . . .

Here, in the second recital, behind the phrase, "a 230 MW electric generating facility in Brandywine, Maryland," the parties enclosed the quoted and capitalized term "Facility," in what appears to be intended as short form for the longer phrase. The parties consistently used the capitalized version of the term "Facility" throughout the contract, which strongly suggest to this Court that the parties intended for the term "Facility" to mean the "230 MW" facility described in the recital.

Even if the Court were to find the definition of the term "Facility" in the recital ambiguous, the Court would be permitted to consider evidence outside of the written agreement to determine the parties' intent. A review of the briefings, exhibits, and oral arguments strongly suggests that the parties intended "Facility" to mean the 230 MW plant in Brandywine, Maryland, as it existed at the formation of the contract. First, nothing in the record indicates that Panda has any plans to sell any portion of the 2.7 MGD of Treated Effluent to a third party, nor does there appear to be any plans to expand the current facility. Not only are there presently no

such plans, it appears that there were never any such plans.  As the Respondent explained in its Opposition to Petitioner's Motion for Summary Judgment, both an Independent Engineer's Report ("IER") and studies submitted to obtain the Certificate of Public Convenience and Necessity ("CPNC") considered a range of conditions "which Panda's facility might reasonably be expected to operate" such as whether "the quality of the cooling water" would permit the water to be "re-used more often" and thus require less gallons from the County's plant.  (Doc. No. 33 at 6-7.)  The parties appear to have relied on these reports to reach an agreement of 2.7 MGD, to account for conditions where the facility "will require 2.65 MGD of treated effluent even under its present configuration."   (*Id.*) Therefore, the Court is convinced that the parties intended for their agreement to limit the use of the Treated Effluent to the 230 MW facility that existed in 1994 and did not contemplate an expansion of the facility or for Panda to have the right to sell unused amounts to third parties.

### B.  Panda's Priority Right to 2.7 MGD of Treated Effluent Actually Needed at the Facility.

The Respondent also asserts that although the County reserved the right to sell excess Treated Effluent to others, this right was subordinate to Panda's priority right to receive a continuous supply of 2.7 MGD . . ." without qualifications or limitations.  (Doc. No. 33 at 4.) Paragraph 2(e) of the agreement provides that

> Notwithstanding any other provisions herein to the contrary, Panda shall have priority over the use and transportation of the Treated Effluent.  The Commissioners shall not enter into any agreements . . .  which would have an immediate or long-term consequence of diminishing the amount of Treated Effluent transported to the Facility . . . without Panda's prior written consent.   Any agreements entered into by the Commissioners with any user other than Panda shall contain language acknowledging that Panda has priority over the use of the amount of Treated Effluent provided for herein.

(Panda Agmt. ¶ 2e.)

Throughout its briefings, and at the hearing, the County made it unequivocally clear that it is obligated to provide Panda with 2.7 MGD of Treated Effluent if Panda actually needs that amount for use in the current facility and not for an expansion of Panda's facility or sale to a third party. However, the County has entered into an agreement with CPV, a competitor of Panda, to supply CPV with a maximum of 5.4 MGD of Treated Effluent from June to October, which could conflict with the County's obligation to Panda if the County is obligated to provide 2.7 MGD of Treated Effluent to Panda without any restrictions or limitations on its use. The County believes that it will have sufficient capacity at its Mattawoman plant to meet both obligations because Panda has historically used no more than 1.7 MGD when at peak operation and the lowest amount of 6.5 MGD of effluent at the Mattawoman would be a rare occurrence. Instead of the County making it clear in the CPV agreement that Panda has priority to 2.7 MGD if actually needed at the current Panda facility, the County merely included a provision that it would seek clarification that "Panda cannot use the Reclaimed Water . . . for any expansion of the Panda facility beyond the 230 MW facility contemplated" in the Panda agreement and that Panda cannot sale the Reclaimed Water to third parties.[6] (CPV Agmt. ¶ 7.8b.) Therefore, because the Court agrees with the County's interpretation that Panda is not entitled to use the Treated Effluent for an expansion of its facility or for sale to third parties; the Court believes that it is unlikely that the potential breach of contract will occur. Nevertheless, the County's agreement with CPV, or any other third parties, should make it unequivocally clear that Panda has priority to 2.7 MGD to the extent that Panda actually needs that amount for use at Panda's current facility.

---

[6] It appears that implied in the County's reasoning is that any increase of Treated Effluent used by Panda would be the result of Panda either expanding its facility or selling the water to third parties.

11

### C. Unreasonable Result

Lastly, Respondent alleges that the County's interpretation would lead to an unreasonable result because it would mean that the County imposed a usage restriction on Panda which in turn would limit the amount of revenue that the County could receive from Panda. Moreover, Panda argues that if the Court were to accept the County's interpretation then it would create an anomalous result such that the contract would impose a usage restriction on Treated Effluent but not on the ground water as a source for cooling water. However, the County counters that it is Respondent's interpretation that is unreasonable because it would result in allowing Panda to control the County's ability to sell unused portions of Treated Effluent even though Panda does not use or pay for it. The County asserts that the agreement clearly provides that the County will control the disposition of excess Treated Effluent as reflected in paragraph 2(e) of the agreement.

If Panda's interpretation is correct, not only is the County prevented from receiving revenue from the unused Treated Effluent, but also nearly 1 million gallons of Treated Effluent are deposited into the Potomac River and Chesapeake Bay on a daily basis. Furthermore, the Court notes that paragraph 7(d) does not provide Panda with a "blank check" to use ground water, but instead states that Panda "has requested approval . . . to utilize ground water in the cooling towers . . . ." (Panda Agmt. ¶ 2e.) Therefore, the Court believes that the County's interpretation is preferred because it leads to a reasonable result that permits the County to sell the nearly 1.0 MGD of unused Treated Effluent to another user, thereby reducing waste into the waterways and providing the County with extra revenue.

## **CONCLUSION**

For the reasons articulated above the Court declares that contract language unambiguously obligates the County to provide 2.7 MGD of Treated Effluent to Panda, but only if Panda actually needs that amount for use in its current facility and not for any expansion or

sale to third parties.  Moreover, in accordance with paragraph 2(e) of the Panda agreement, the County should make it unequivocally clear in its agreements with third parties that Panda has priority to 2.7 MGD if actually required for operation of Panda's 230 MW facility.  Accordingly, the Petitioner's Motion for Summary Judgment is **GRANTED** and the Respondent's Cross Motion for Summary Judgment is **DENIED**.  The Court will issue an order consistent with this opinion in a separate document.

<u>October 19, 2009</u>                                                          <u>            /s/            </u>
    Date                                                                                      Alexander Williams, Jr.
                                                                                              United States District Court Judge